Christopher R. Reilly (FBN: 1025097)
**BURSOR & FISHER, P.A.**
701 Brickell Avenue, Suite 1420
Miami, FL 33133
Telephone: (305) 330-5512
Facsimile: (305) 679-9006
Email: creilly@bursor.com

Joshua D. Arisohn*
Philip L. Fraietta*
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150
jarisohn@bursor.com
pfraietta@bursor.com

Scott R. Drury*
**DRURY LEGAL, LLC**
6 Carriage Lane
Highwood, Illinois 60040
Telephone: (312) 358-8225
scott@drurylegal.com

*Attorneys for Plaintiff and the Class*

## IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
## IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

| | |
|---|---|
| COLIN CARLSEN, for himself and others similarly situated, | CIVIL DIVISION |
| *Plaintiff*, | Case No. _____ |
| v. | |
| FLORIDA HEALTH SCIENCES CENTER, INC., doing business as TAMPA GENERAL HOSPITAL, | **JURY TRIAL DEMANDED** |
| *Defendant*. | |

## COMPLAINT

Plaintiff Colin Carlsen ("Plaintiff"), on behalf of himself and all other similarly situated individuals (the "Class Members"), against Defendant Florida Health Sciences Center, Inc., doing business as Tampa General Hospital ("Defendant" or "Tampa General"), brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

1

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all Florida residents who have accessed and used the following website that Defendant owns and operates: www.tgh.org (the "Website").

2.      At relevant times, Defendant aided employed, agreed and conspired with Facebook/Meta[1] to intercept communications sent and received by Plaintiff and Class Members, including communications containing protected medical information.  Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over this action seeking declaratory relief, injunctive relief and damages in excess of $30,000 (exclusive of court costs, attorneys' fees and interest) pursuant to Article V, section 5(b) of the Florida Constitution and Florida Statutes §§ 26.012 and 86.011.

4.      The Court has personal jurisdiction over Defendant because it is headquartered in Tampa, Florida, and it regularly conducts business in Hillsborough County, Florida.

5.      Venue is proper pursuant to Florida Statutes § 47.011, *et seq.*, because Defendant's principal place of business is located in Hillsborough County, Florida.

## THE PARTIES

*Plaintiff*

6.      Plaintiff Colin Carlen is an adult citizen of Florida and is domiciled in The Villages, Florida.

---

[1] In October 2021, Facebook, Inc. changed its name to Meta, Inc.  Unless otherwise indicated, Facebook, Inc. and Meta, Inc. are referenced collectively herein as "Facebook."

7.     At relevant times, Plaintiff has used the Website to book medical appointments and review results using the Tampa General patient portal.  Plaintiff first used the Website for the above-stated purposes in approximately 2021.  Plaintiff accessed the Website using his smartphone and a desktop computer.   As described below, when Plaintiff used the Website to book appointments, he disclosed medical information regarding his medical condition, history or treatment.

8.     Plaintiff also has an active Facebook account which he has maintained since 2009.  Plaintiff accesses his Facebook account from a smartphone, tablet, laptop, and desktop.

***Defendant***

9.     Defendant Florida Health Sciences Center, Inc. is a private not-for-profit hospital that does business as Tampa General Hospital.  Defendant's principal place of business is in Florida.  Defendant employs over 8,000 individuals.  Defendant's 2021 reported revenues were approximately $1.841 billion.  Defendant offers a full range of medical services, including inpatient, outpatient and emergency care, and treats hundreds of thousands of patients each year.

10.     Pursuant to the systematic process described herein, Defendant assisted Facebook with intercepting Plaintiff's communications, including those that contained personally identifiable information, protected health information and related confidential information.  Defendant assisted these interceptions without Plaintiff's knowledge, consent or express written authorization.

11.     By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and protected health information.

## FACTUAL ALLEGATIONS

***Florida's Security of Communications Act***

12.     Where there is a reasonable expectation of privacy, absent the consent of all parties, the Florida Security of Communications Act (the "FSCA") prohibits, among other things the intentional interception or procurement of another person to intercept any wire, oral or electronic communication.  Fla. Stat. §§ 934.03(1), 934.03(2)(d).

13.     Any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, a wire, electronic or oral communication in violation of the FSCA is subject to a civil action for, among other things: (a) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs reasonably incurred. Fla. Stat. § 934.10.

14.     Under the FSCA, "intercept" is defined as the "[a]ural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  Fla. Stat. § 934.02(3).

15.     Under the FSCA, "contents" in the context of "any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication."  Fla. Stat. § 934.02(7).

16.     Under the FSCA, "person" is defined as, *inter alia*, "any individual, partnership, association, joint stock company, trust, or corporation."  Fla. Stat. § 934.02(5).

17.     With some exclusions that do not impact Plaintiff's claims, under the FSCA, "electronic communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic,

4

photoelectronic, or photo-optical system that affects intrastate, interstate, or foreign commerce . . . ." Fla. Stat. 934.02(12).

### Defendant Tampa General

18.    Defendant Tampa General has over eighty locations across Florida that provides treatment in a broad range of areas. Defendant has 1,041 hospital beds and in 2022 had over 650,000 outpatient visits and over 56,000 inpatient discharges.

19.    Defendant owns and operates the Website, which is accessible on mobile devices and desktop computers.

### Facebook's Platform and Business Tools

20.    Facebook describes itself as a "real identity platform,"[2] meaning users are allowed only one account and must share "the name they go by in everyday life."[3]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[4]

21.    In 2021, Facebook generated $117 billion in revenue.[5]  Roughly 97% of that came from selling advertising space.[6]

22.    Facebook sells advertising space by highlighting its ability to target users.[7]

---

[2] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[3] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[4] FACEBOOK, SIGN UP, https://www.facebook.com/.
[5] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx.
[6] *Id.*
[7] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

Facebook can target users so effectively because it surveils user activity both on and off its site.[8] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[9] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

23.  Advertisers can also build "Custom Audiences."[11] Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12] With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[13] Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data. Advertisers can do so through two mechanisms: (a) by manually uploading contact information for customers; or (b) by utilizing Facebook's "Business Tools."[14]

---

[8] FACEBOOK, ABOUT FACEBOOK PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[9] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting.

[10] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK,
https://www.facebook.com/business/news/Core-Audiences.

[11] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[12] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR
BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[13] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[14] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494;

24.     As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[15]  Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

25.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, the webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[16]  Facebook's Business Tools can also track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[17]  Advertisers can even create their own tracking parameters by building a "custom event."[18]

26.     One such Business Tool is the Facebook Tracking Pixel.  Facebook offers this piece of code to advertisers, like Defendant, to integrate into their websites.  As the name implies, the

---

FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[15] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[16] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[17] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[18] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

Facebook Tracking Pixel "tracks the people and type of actions they take."[19]  When a user accesses a website hosting the Facebook Tracking Pixel, Facebook's software script surreptitiously directs the user's browser to send a separate message to Facebook's servers.  This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Facebook Tracking Pixel is configured to collect.  This transmission is initiated by Facebook code and concurrent with the communications with the host website.  Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code and Facebook's embedded code.

27.     An example illustrates the point.  Take an individual who navigated to the Website and clicked on a tab for lung cancer.  When that tab was clicked, the individual's browser sent a GET request to Defendant's server requesting that server to load the particular webpage.  Because the Facebook Tracking Pixel was embedded in the Website, Facebook's embedded code, written in JavaScript, sent secret instructions back to the individual's browser, without alerting the individual that this was happening.  Facebook caused the browser to secretly and concurrently duplicate the communication with the Website, transmitting it to Facebook's servers, alongside additional information that transcribed the communication's content and the individual's identity.

28.     After collecting and intercepting the information described in the preceding paragraph, Facebook processed it, analyzed it and assimilated it into datasets like Core Audiences and Custom Audiences.

---

[19] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

*How Defendant Disclosed Plaintiff's and Class Members' Protected Health Information and Assists with Intercepting Communications*

29.     Through the Facebook Tracking Pixel, Defendant shared its patients' identities and online activity, including information and search results related to their private medical treatment.

30.     An investigation by *The Markup* (the "Markup Investigation") revealed that thirty-three of the top 100 hospitals in the United States, as ranked by *Newsweek*, had the Facebook Tracking Pixel embedded on the appointment schedule pages of their websites, among other possible places.[20]  Tampa General is one of the identified websites.[21]

31.     According to the Markup Investigation, the hospital websites were "collecting patients' sensitive health information – including details about their medical conditions, prescriptions, and doctor's appointments – and sending it to Facebook."[22]

32.     The Markup Investigation further revealed that the data sent to Facebook was connected to: (a) the IP address of the computer sending the information, providing Facebook with the ability to connect the sensitive information to a specific individual or household; or, worse: (b) a specific Facebook user if the user was logged into their Facebook account when using the Website.[23]

33.     The Markup Investigation provided the following examples of the types of information surreptitiously intercepted by Facebook: (a) "clicking the 'Schedule Online' button on a doctor's page [of a specified hospital] prompted the [Facebook Tracking Pixel] to send

---

[20] Todd Feathers, *et al.*, FACEBOOK IS RECEIVING SENSITIVE MEDICAL INFORMATION FROM HOSPITAL WEBSITES, THE MARKUP ("Markup Investigation") (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.
[21] *Id.*
[22] *Id.*
[23] *Id.*

9

Facebook the text of the button, the doctor's name, and the search term we used to find her: 'pregnancy termination'"; and (b) clicking the "Schedule Online Now' button on a different website "prompted the [Facebook Tracking Pixel] to send Facebook the text of the button, the doctor's name, and the condition we selected from the dropdown menu: "Alzheimer's."[24]

34.    The startling information revealed in the Markup Investigation prompted a former senior privacy advisor for the U.S. Department of Health and Human Services' Office for Civil Rights ("Office for Civil Rights") to remark on the troubling nature of the conduct: "I am deeply troubled by what [the hospitals] are doing with the capture of [patients'] data and the sharing of it."[25]

***How Defendant Disclosed Protected Health Information***

35.    Via the Website, Defendant allows patients to select options like "Find a Doctor," "Find a Location" and "Schedule Now."[26]



---

[24] *Id.*
[25] *Id.*
[26] https://www.tgh.org/.

10

36.     When patients click "Find a Doctor," they can search by "specialty practice, or provider name."[27]



37.     When patients click "Schedule Now," they can schedule an appointment via the Website.[28]



---

[27] https://www.tgh.org/find-doctor.
[28] https://www.tgh.org/schedule.

38.     Upon information and belief, at relevant times, whenever patients searched their treatment or condition, or whenever patients scheduled an appointment, Defendant procured Facebook to intercept communications that contain protected health information.

39.     Each time Defendant sent this content, it also disclosed a patient's personally identifiable information, including their Facebook ID ("FID").  An FID is a unique and persistent identifier that Facebook assigns to each user.  With it, any ordinary person can look up the user's Facebook profile and name.  Notably, while Facebook can easily identify any individual on its own Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID.  Facebook admits as much on its website.  Indeed, to find a corresponding profile, a person need only attach the FID to the end of the URL for Facebook, typing in Facebook.com/[FID].

40.     A user who accessed Defendant's Website while logged into Facebook transmitted what is known as the "c_user cookie" to Facebook, which contained that user's unencrypted Facebook ID.

41.     When a visitor's browser had recently logged out of an account, Facebook compelled the visitor's browser to send a smaller set of cookies.

42.     One such cookie was the "fr cookie" which contained, at least, an unencrypted Facebook ID and browser identifier.  Facebook, at a minimum, used the fr cookie to identify users.[29]

43.     If a visitor never created an account, a smaller set of cookies was transmitted.

---

[29] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

44.     At each stage, Defendant also utilized the "_fbp cookie," which attached to a browser as a first-party cookie, and which Facebook used to identify a browser and a user. [30]

45.     The fr cookie expired after 90 days unless the visitor's browser logged back into Facebook. [31]   If that happened, the time reset, and another 90 days began to accrue. [32]

46.     The _fbp cookie expired after 90 days unless the visitor's browser accessed the same website. [33]   If that happened, the time reset, and another 90 days began to accrue. [34]

47.     The Facebook Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*e.g.*, the Website. [35]   A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"— *e.g.*, Facebook. [36]   The _fbp cookie was and is always transmitted as a first-party cookie.  A duplicate _fbp cookie was and is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

48.     At relevant times, Facebook, at a minimum, used the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.  Defendant sent those identifiers alongside the event data.

49.     Plaintiff never consented, agreed or otherwise permitted Defendant to disclose his

---

[30] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[31] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[32] Confirmable through developer tools.
[33] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[34] Also confirmable through developer tools.
[35] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.
[36] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

personally identifiable information and protected health information.  Plaintiff was never provided with any written notice that Defendant disclosed its users' protected health information, nor was Plaintiff provided any means of opting out of such disclosures.  Defendant nonetheless knowingly disclosed Plaintiff's protected health information to Facebook.

50.     By law, Plaintiff is entitled to privacy in his protected health information and confidential communications.  Defendant deprived Plaintiff of his privacy rights by procuring Facebook to intercept these communications by implementing a system that surreptitiously tracked, recorded and disclosed Plaintiff's and other patients' confidential communications, personally identifiable information and protected health information.  Plaintiff did not discover that Defendant disclosed his personally identifiable information and protected health information to Facebook, and assisted Facebook with intercepting Plaintiff's communications with Defendant, until January 2023.

### The Expectation of Privacy in Healthcare Information

51.     An individual's medical records and information are among the most sensitive type of personal information.

52.     The Health Insurance Portability and Accountability Act of 1996 ("HIPPA") imposes strict standards to protect sensitive patient health information from being disclosed without the patients' knowledge and consent.  *See* 45 C.F.R. § 160, *et seq.*

53.     On December 1, 2022, the Office for Civil Rights issued a bulletin titled *Use of Online Tracking Technologies by HIPPA Covered Entities and Business Associates* (the "Bulletin") in which it addressed the impropriety of healthcare providers utilizing tracking technologies such as the Facebook Tracking Pixel in a manner that impermissibly discloses

protected health information ("PHI") in violation of the HIPPA.[37]

54.     According to the Office for Civil Rights, "**[r]egulated entities** [those to which HIPPA applies] **are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of [protected health information] to tracking technology vendors or any other violations of the HIPPA Rules."**[38] As set forth in the Bulletin, "disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPPA-compliant authorizations, would constitute impermissible disclosures."[39]

55.     Outside of HIPPA, the Office for Civil Rights warned that an impermissible disclosure of an individual's PHI could result in a wide range of additional harms to the individual or others.[40] "For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or others identified in the individual's PHI."[41]

56.     The Office for Civil Rights noted the broad range of information that constitutes PHI, including "individually identifiable health information" ("IIHI") such as "an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code."[42] According to the Bulletin, IIHI can constitute PHI because:

---

[37] U.S. Dep't of Health and Human Services – Office for Civil Rights, Use of Online Tracking Technologies by HIPPA Covered Entities and Business Associates (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.
[38] *Id.* (emphasis in original).
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.*

when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (*i.e.*, it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[43]

57.     The Office for Civil Rights concluded that "it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPPA Privacy Rule."[44]

58.     As a result of Defendant's conduct, as alleged herein, Plaintiff and Class Members have been exposed to the harms and impending harms described in the Bulletin.

59.     Moreover, "courts have recognized the 'growing trend across courts . . . to recognize the lost property value' of personal information. *In re Marriott Int'l, Inc., Cust. Data Sec. Breach Litig.*, 440 F.Supp.3d 447, 461 (D. Md. 2020) . . .; *see also In re Facebook Privacy Litigation*, 557 F.App'x. 494, 494 [sic] (9th Cir. 2014)." *Calhoun v. Google LLC*, 526 F.Supp.3d 605, 636 (N.D. Cal. 2021)."

## CLASS ACTION ALLEGATIONS

60.     Pursuant to Florida Rule of Civil Procedure 1.220, Plaintiff brings this action individually and on behalf of the following Class: All natural persons in the State of Florida whose personal information was collected through the Facebook Tracking Pixel.

61.     Plaintiff reserves the right to amend or modify the Class definition with greater specificity or division and/or to add subclasses after having had an opportunity to conduct discovery.

62.     Excluded from the Class are: (a) Defendant; (b) any parent, affiliate or subsidiary

---

[43] *Id.*
[44] *Id.* (emphasis in original).

of Defendant; (c) any entity in which Defendant has a controlling interest; (d) any of Defendant's officers or directors; (e) any successor or assign of Defendant; (f) any judge or court personnel assigned to this case and members of their immediate families; and (g) Plaintiff's counsel and Defendant's counsel and anyone employed by them.

63.     **Numerosity.**   The Class is so numerous that joinder of all members is impracticable.  While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the Class contains at least hundreds of thousands of individuals, and the members can be identified through Defendant's records.  Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, social media and/or published notice.

64.     **Commonality.**  Common questions of law and fact exist as to all Class Members. These common questions of law or fact predominate over any questions affecting only individual members of the Class.  Common questions include, but are not limited to the following:

a.   Whether Plaintiff and Class Members had a reasonable expectation of privacy in their sensitive health information communicated to their healthcare providers;

b.   Whether Defendant violated Plaintiff's and Class Members' privacy rights;

c.   Whether Defendant intentionally tapped the lines of internet communication between Plaintiff and Class Members and their medical providers;

d.   Whether Defendant's Website surreptitiously recorded personally identifiable information, protected health information and related communications and simultaneously, or subsequently, disclosed that information to Facebook.

e.   Whether Facebook is a third-party eavesdropper;

f.   Whether Defendant's disclosure of personally identifiable information, protected health information and related communications constituted an affirmative act of communication;

g.   Whether Defendant's actions violated the FSCA; and

h.   Whether Plaintiff and Class Members are entitled to damages under the FSCA.

65.   **Typicality.**   Plaintiff's claims are typical of the claims of the Class he seeks to represent because Plaintiff and all Class Members have suffered similar injuries as a result of the same practices alleged herein.  Plaintiff has no interests to advance adverse to the interests of the other Class Members, and Defendant has no defenses unique to Plaintiff.

66.   **Adequate Representation.**   Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class and has retained as his counsel attorneys competent and experienced in class actions and complex litigation, including litigation to remedy privacy violations.  Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of Class Members, and they have the resources to do so.

67.   **Predominance.**   Common questions of law and fact predominate over any questions affecting only individual class members.  For example, Defendant's liability and the fact of damages is common to all members of the Class.

68.   **Superiority and Manageability.**   A class action is superior to other available means for the fair and efficient adjudication of this dispute.  The injury suffered by each Class Member, while meaningful on an individual basis, may not be of such magnitude as to make the prosecution of individual actions against Defendant economically feasible.  Even if Class Members could afford individual litigation, those actions would put immeasurable strain on the court system.  Moreover, individual litigation of the legal and factual issues of the case would increase the delay

and expense to all parties and the court system.   A class action, however, presents far fewer management difficulties and provides the benefit of single adjudication, economy of scale and comprehensive supervision by a single court.

**CLAIMS FOR RELIEF**

**<u>COUNT I</u>**
**Violation of the Florida Security of Communications Act**
**Fla. Stat. 934.01, *et seq.***

69.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

70.     Plaintiff brings this Count individually and on behalf of the members of the Class.

71.     The Florida Security of Communications Act ("FSCA") prohibits: (1) the interception or procurement of another to intercept any wire, oral or electronic communication; (2) the intentional disclosure of the contents of any wire, oral or electronic communication that the discloser knew or should have known was obtained through the interception of a wire, oral or electronic communication; and (3) the intentional use of the contents of any wire, oral or electronic communication that the discloser knew or should have known was obtained through the interception of a wire, oral or electronic communication.   Fla. Stat. 934.03(1).

72.     Any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, a wire, oral or electronic communication in violation of the FSCA is subject to a civil action for: (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.   Fla. Stat. 934.10.

73.     At all relevant times, Defendant procured Facebook to contemporaneously track and intercept Plaintiff's and Class Members' internet communications while navigating the

Website.  Defendant procured Facebook to contemporaneously intercept these communications without authorization and consent from Plaintiff and Class members.

74.     Defendant, when procuring Facebook to intercept Plaintiff's and Class Members' communications, intended Facebook to contemporaneously learn the meaning of the content of Plaintiff's and Class Members' communications with Defendant.

75.     Plaintiff and Class Members had a justified and reasonable expectation under the circumstances that their electronic communications would not be intercepted.

76.     Plaintiff and Class Members were not aware that their electronic communications were being intercepted by Facebook and did not consent to the interception.

77.     In connection with procuring Facebook's contemporaneous interception of Plaintiff's and Class Members' communications with Defendant, Defendant embedded the Facebook Tracking Pixel on the Website.

78.     The Facebook Tracking Pixel constitutes an electronic or other device through which the contents of a wire, oral and electronic communication can be acquired, including the contents of Plaintiff's and Class Members' communications with Defendant via the Website.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.     Determining that this action is a proper class action;

b.     For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

c.     For an order declaring that Defendant's conduct violates the statute referenced herein;

d.      For an order finding in favor of Plaintiff and the Class on the count asserted
        herein;

e.      Awarding compensatory damages, including statutory damages where available,
        to Plaintiff and Class Members against Defendant for all damages sustained as a
        result of Defendant's wrongdoing, in an amount to be proven at trial;

f.      For punitive damages, as warranted, in an amount to be determined at trial;

g.      Ordering Defendant to disgorge revenues and profits wrongfully obtained;

h.      For prejudgment interest on all amounts awarded;

i.      For injunctive relief as pleaded or as the Court may deem proper;

j.      For an order awarding Plaintiff and the Class their reasonable attorneys' fees and
        expenses and costs of suit; and

k.      Granting Plaintiff and Class Members such further relief as the Court deems
        appropriate.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all claims so triable in this action.


Dated:  January 27, 2023                    Respectfully submitted,

                                            By: */s/ Christopher R. Reilly*
                                                Christopher R. Reilly

                                            **BURSOR & FISHER, P.A.**
                                            Christopher R. Reilly (FBN: 1025097)
                                            701 Brickell Avenue, Suite 1420
                                            Miami, FL 33133
                                            Telephone: (305) 330-5512
                                            Facsimile: (305) 679-9006
                                            Email:  creilly@bursor.com

                                            **BURSOR & FISHER, P.A.**
                                            Joshua D. Arisohn*
                                            Philip L. Fraietta*
                                            888 Seventh Avenue
                                            New York, NY 10019
                                            Tel: (646) 837-7150

Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
        pfraietta@bursor.com

**DRURY LEGAL, LLC**
Scott R. Drury*
6 Carriage Lane
Highwood, Illinois 60040
Telephone: (312) 358-8225
E-Mail: scott@drurylegal.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Putative Class*